W. LEDYARD THOMPSON et al.

*v.*

FREDERICK B. WILLIAMSON et al.

[Filed July 21st, 1904.]

1. Complainants sued one of their customers in New York for a balance alleged to be due on account for the purchase and sale of stock as brokers. The customer appeared and answered, but did not specially set up that the claim was based on a gaming transaction. Complainants obtained judgment, and sued on it in New Jersey; again obtained judgment, and filed their bill in equity to set aside conveyances of the debtor's property, alleged to have been fraudulent as against them.—*Held*, that in the absence of proof of the laws of New York the presumption is that the common law rule, making a judgment conclusive between the parties, prevails in New York, so that the defence of a gaming transaction was not open to the debtor.

2. On the same presumption, the New Jersey judgment is conclusive between the parties, and the defence of a gaming transaction was not open to the debtor.

3. Grantees of a judgment debtor, not parties to the action in which the judgment is rendered, are not concluded by a judgment against their grantor from setting up the defence that the recovery was based on a gaming transaction.

4. An arrangement between customer and brokers for *bona fide* contracts of purchase and sale of stocks by the brokers with third persons does not become a wagering contract unless there is a further agreement or understanding between the brokers and customer that the *bona fide* deliveries contemplated between the broker and the third persons are not to be carried into effect between the brokers and their customer, and that, as between them, there is to be no other liability on either side than settlement of differences.

5. The burden of proof to establish a gaming transaction is on the person asserting illegality.

6. Since *Gen. Stat. p. 1606 § 1,* declares wagers unlawful, and section 2 entitles the loser to maintain an action to recover the amount lost, a court of equity, in a suit to set aside conveyances alleged to be fraudulent against brokers as judgment creditors of the grantor, where defendants seek equitable protection on the ground that the recovery of the judgment was based on a gaming transaction between the brokers and the grantor, would make effective, even against voluntary grantees of the debtor, the rule of public policy declared in the statute by discarding from the illegal transactions on both sides all rights or liabilities that.arise or are enforceable only as claims under the illegal contract.

7. Where a conveyance is made to a creditor of a judgment debtor for a valuable consideration received prior to incurring the indebtedness on which the judgment was founded, but subsequent to the rendition of the judgment, while both debts were existing, it amounts to a preference of one creditor over another, but is not illegal.

---

Heard on bill, answer, replication and proofs.

*Mr. Percy W. Crane, Mr. Edward Q. Keasbey* and *Mr. Howard E. White* (of the New York bar), for the complainants.

*Mr. Theodore C. English* and *Mr. Foster M. Voorhees,* for the defendants.

EMERY, V. C.

Complainants are stockholders doing business in the New York Stock Exchange, and on May 2d, 1902, recovered a judgment in the supreme court of the State of New York against the defendant Frederick B. Williamson for the sum of $10,-587.08, the balance due complainants on their account as brokers for the purchase and sale of stocks between March 8th, 1898, and May 31st, 1899, with interest and costs. Suit in the New

Jersey supreme court was subsequently brought against this defendant, who resides in New Jersey, upon the New York judgment, and a judgment obtained in this state, upon which execution was issued and returned unsatisfied. The suit in New York was commenced in July, 1899, and in October, 1899, the defendant, through a third person, conveyed to his wife, Mary I. Williamson, his real estate, consisting of three parcels of land in Elizabeth. These conveyances were voluntary, and it was so conceded at the hearing. Mrs. Williamson and her husband subsequently, in March, 1902, conveyed a small portion of the lands to the defendant, Mrs. Emily B. Williamson, a sister-in-law, and this defendant claims to be a *bona fide* purchaser of the lot conveyed to her. Complainants' bill seeks to set aside both conveyances as fraudulent against them, and the defence set up by the judgment debtor himself, as well as by his wife as his grantee, and also by her grantee, is that the judgment in New York was founded on transactions which are in New Jersey held to be gaming transactions, and the judgment is therefore not enforceable in the courts of equity of this state against the judgment debtor or his grantee, whether voluntary or otherwise. So far as the judgment debtor himself is concerned, the defence is not available.

The judgment in New York was obtained in a suit in which the defendant appeared, and by an answer contested the complainants' claim, not especially setting up, however, the defence of a gaming transaction, but the answer did set up that by the agreement between the parties the complainants, for all advances to him over $2,000, were to be repaid only out of the sale of the securities. Under the federal constitution full faith and credit must be given in the courts of this state to the judgment obtained in New York, and the same effect as to finality must here be given as would be given in the State of New York. There is no proof in this case that in the State of New York a judgment so obtained is not final between the parties as to all defences which were or could have been set up in the suit, or that a judgment can there be avoided if founded on gaming transactions. In the absence of such proof, it must be presumed

that the rule of the common law as to the effect of such judgment prevails, and that the judgment is final and conclusive, and that the New Jersey judgment is also conclusive as being based thereon. As to the defendants who are grantees of the judgment debtor, and who were not parties to the suit in which the judgment for the debt was recovered, the rule is settled in this state that they are not concluded by the judgment from setting up that the recovery was upon gambling transactions, and therefore should not be enforced against them. In *Minzesheimer* v. *Doolittle, 60 N. J. Eq. (15 Dick.) 394 (Court of Errors and Appeals, 1899)*, this defence was sustained in behalf of the wife of the debtor, and the bill seeking to set aside a conveyance of the debtor's property to her as voluntary and fraudulent, was dismissed without inquiring into the consideration. It is true that in this case the conveyance was made not only before the institution of the suit and recovery of the judgment, but before the incurring of the debt upon which the judgment was obtained, and in that respect differs from the case in hand, where the debt existed and the suit was instituted before the conveyance. But this circumstance bears only upon the character of the proof of fraud required, and in view of the ground upon which the decision is based, viz., the right of the grantee to a day in court to defend the title against all acts or admissions of the grantor, after the date of the deed, I consider the decision as controlling this case and as overruling on this point *Mc-Canless* v. *Smith, 51 N. J. Eq. (6 Dick.) 505 (1893)*, in which Vice-Chancellor Pitney held that the wife of a judgment debtor, claiming under a voluntary settlement of her husband's lands, could not question the validity of the judgment as based on an illegal gambling transaction. The questions, therefore, as to both of the grantees are—*first,* whether the defence that the transactions were gambling transactions is made out on the proofs; and *secondly,* whether, if made out, protection against the enforcement of the judgment should be afforded so far as the judgment may be equitably based on money paid to the defendant. The proofs in the case show that the transactions. between the complainants, as brokers, and Williamson, as their

customer, consisted in the execution by them of orders given by the customer, for the purchase or sale of stocks in the New York Stock Exchange, and that so far as the brokers were concerned there was in the execution of every order an actual purchase or sale of the stock by them for cash paid or received, and perfected by delivery to or from other brokers of the exchange, and that such actual purchase or sale of the broker was contemplated by the customer and required by the rules of the stock exchange.

In each case the transaction was reported to the customer as a purchase or sale on his account, and the names of the brokers from whom the stock was purchased, or to whom it was delivered, were given in the report. On such purchase or sale the brokers charged a fixed commission—one-eighth of one per cent. The stocks purchased were not, during the running of this account, in any instance, actually delivered by the brokers to the customer, but were, until directed to be sold, retained by them as collateral for the sums advanced for their purchase, and for the balance due on the account. For the purpose of raising money, the stocks themselves were sometimes pledged by the brokers with banks as collateral for their own loans, and on the sale for the customer were taken up for delivery. The customer was charged monthly with interest on the balances, the brokers crediting him with dividends on the stock received by them, and the commission, with these charges for interest balances, represents the entire profit or advantage to the brokers in the whole transaction. These amounts of commissions are fixed sums, and the rate charged for interest depended on the market rate for money, and was usually one per cent. more than the brokers themselves paid on procuring from their banks loans for executing these purchases and sales. On opening the account, in March, 1898, Williamson deposited $1,000 as a margin or security on ordering a purchase of one hundred shares of stock, which cost the brokers $9,250, but made no further deposits for this or any other purpose. During the running of the account he received, however, as stated above, from the brokers about $9,000 in cash, which was charged to his account,

this amount about equaling the charges for interest ($2,842.23) and for commissions, about $6,000. The account covered the purchase and sale of about twenty-five thousand shares of stock in all, and the balance due from the customer on the entire account, on June 15th, 1899, when it was closed, was $9,053.39. The total amount of the purchases for the entire period was over $1,800,000 par value, but the number of transactions was very large and consisted mainly of purchases of stock. In some instances there were sales of stock "short," but the number or proportion of these short sales does not clearly appear from the accounts or the evidence. The amounts due on purchases or sales were, up to May 5th, 1899, in every instance taken care of by a counter-sale or purchase, but there was no express agreement, either on opening the account or at any time subsequently, that they should be provided for by this method alone. During the earlier period of the account the stocks purchased were not subject to any wide range of fluctuation in value and the transactions were frequent, but the profits or losses were small, and taking into account the value of the securities in the brokers' hands, the amount of the balance due during most of the account, if not during the whole of it, was not so large as to be beyond the customer's financial ability to satisfy. The largest number of shares carried at any one time was one thousand seven hundred shares, held at the closing of the purchases, and the average number, taking the whole amount through, was perhaps one thousand shares or less, with a par value of $100,000 and a general borrowing value of about $80,000. No statement in detail has been made, but Mr. Thompson, one of the complainants, says that up to the time of closing his account at no time was this indebtedness (after deducting the value of the securities) over $30,000, an amount much less, as he supposed, than the estimate which Williamson gave him of his property while the account was running.

And Mr. Thompson's evidence shows, I think, that Mr. Williamson's financial ability was actually relied on by the brokers, both in opening and in continuing the account. There was certainly no express agreement on their part to relieve the

customer from liability, and on May 5th, 1899, they requested Williamson to take up the securities then in their hands and purchased on his account, or to protect them by sending $10,000 as margin. He failed to comply with this request, and subsequently, under his instructions, the stocks were sold and a loss resulted. After being notified, on May 5th, to take up the securities or increase his margin, Williamson does not seem to have made any claim that he was not obliged to take the securities, and after the stocks had been sold by his direction he made, on June 7th, a proposal, in writing, to transfer property to secure the balance due on making the sale. In the New York suit an answer under oath was put in, but the defendant defaulted at the trial. The answer denied the correctness of the statement of the account, and also set up that by the agreement between the parties, the complainants, for all advances to him over $2,000, were to be repaid only out of the sale of the securities. The main question now to be decided is the issue of fact as to the real nature of the transaction upon all the evidence.

There was in this case, as I have said, no actual delivery by the brokers to Mr. Williamson of any of the stocks purchased for him, nor any delivery by him to the brokers of any stocks sold, and Mr. Williamson now swears that he did not expect nor intend to receive or deliver the stocks. The evidence clearly indicates, I think, that so far as Mr. Williamson was concerned his object and intention was not investment, but speculation, and that in a sense in which the word is often used he was gaming or gambling on the stock exchange. But the question in the case is not whether Williamson was speculating, and in this sense gaming or gambling through his brokers, but whether the contracts or agreements between him and the brokers, under which his speculations were carried on, were, on the part of both parties, wagers or gaming contracts, under our statute. The essence of a wager is that each party stands to win or lose on the result, and that the gains depend on the event. *Carlill* v. *Carbolic Smoke Ball Co., 61 L. J. (N. S.) 696, 700 (1892); L. R. 2 Q. B. 484, 491; 14 Am. & Eng. Encycl. L. (2d ed.) 669.* And both parties to the alleged illegal contract must intend a

gaining transaction. *Grizewood* v. *Blane, 11 C. B. (73 E. C. L.) 526, 541 (1851)*; *Clews* v. *Jamieson, 182 U. S. 461, 489, &c. (1900)*. It was admittedly the intention of both parties in this case that *bona fide* contracts for purchase and sale should be entered into by the brokers with third persons, and that the brokers should carry out these contracts, receiving therefor their commissions and nothing else, and that all the gain or loss resulting from the rise or fall of stocks should belong to the customer. The only other right of the brokers against the customer was by way of indemnity against loss by reason of carrying out orders, being interest charges and expenses, and was not by way of profit. These arrangements between customer and broker for *bona fide* contracts of purchase and sale by the brokers with third persons may become or be wagering contracts, but only by reason of some further agreement or understanding between the brokers and customer that the *bona fide* deliveries contemplated between the broker and third persons are, by the understanding between both parties, not to be carried into effect between the broker and his customer, and that as between them there is to be no other liability on either side than a settlement of differences. Under such an arrangement the brokers, as well as the customer, equally stand to gain or lose by the rise or fall of prices, and the parties have no other interest or right against each other under the entire contract than that resulting from the differences. A contract of this kind, when proved to exist, is a gaming contract, and securities given to the broker to secure the payment by the customer of the differences arising from the purchases and sales with third persons by the broker cannot be enforced. *Flagg* v. *Baldwin, 38 N. J. Eq. (11 Stew.) 219*. Where actual deliveries to the broker and *bona fide* transactions between him and third persons to carry out the orders of his customer are contemplated, and there is no proof of any further contract between the broker and customer by which the right either to call for or tender deliveries as between themselves has been excluded, the general view of courts of the highest authority at the present time is that the circumstance that actual sales or purchases by the broker and

deliveries to him are contemplated, is decisive against the contract being a wagering contract on the part of both parties.
*Forget* v. *Ostigny, App. Cas. 318, 324 (Lord Herschell, 1895)*;
*Clews* v. *Jamieson, 182 U. S. 461 (1900)*; *In re Taylor's Estate
(Appeal of Howard), 43 Atl. Rep. 973 (1899)*. The burden of
proof that there was such further understanding or contract
between the customer and broker, to control or render invalid
the reciprocal obligations arising between them on the making
by the broker of the actual contracts with third persons, on
behalf of the customer, is upon the person asserting the illegality.
*Pratt* v. *Boody, 55 N. J. Eq. (10 Dick.) 175, 182 (1896)*;
affirmed on this point, *56 N. J. Eq. (11 Dick.) 429; Clews* v.
*Jamieson, supra*. In *Flagg* v. *Baldwin* an express contract of
this character was alleged and sworn to by the customer, and on
the facts was held to be sufficiently proved. It is urged very
strenuously, that by reason of the existence in this case of many
of the facts which were relied on by the court of errors and appeals in *Flagg* v. *Baldwin* as evidence that the contract was a
wagering contract, the decision in that case is conclusive in this
as to the result of the same facts. But where cases are to be decided upon questions of fact, the bearing or effect of all the facts
found to be proved is the real basis of the decision, and the views
of the court as to the value of particular evidence in one case is
not to be considered as conclusive of its value in other cases, where
different circumstances are to be taken into consideration. *Colls*
v. *Home & Col. Stores, App. Cas. 179, 191 (Lord MacNaghten,
1904)*, approving Lord-Justice Brett, in *Ecclesiastical Commissioners* v. *Kino, 14 Ch. Div. 213 (1880)*, as to the treating
decisions on questions of fact as authority. In *Flagg* v. *Baldwin*,
proof of an express contract was certainly relied on, and was
held to be corroborated by the dealings between the parties. In
some speculations, such as contracts for future delivery in the
cotton exchanges, the circumstances may be such as to satisfy
the court that it was the intention of both broker and customer
that the purchase or sale was to be protected or provided for only
by a counter-transaction of sale or purchase, and that both parties intended there should be no delivery at all, either to or by

the broker, and that the only settlement was to be of the differences. Such purchases or sales are held, as between the broker and customer, to be colorable only and mere wagers for differences to be settled between them. *Minzesheimer* v. *Doolittle, supra.* But where actual deliveries of stock to and by the broker and third persons are contemplated by both the customer and broker, the further agreement that there were to be no deliveries as between themselves should be made out, either by proof of an express contract to that effect or by circumstances clearly indicating a mutual understanding or agreement, that there were to be no deliveries, and that the parties relied solely on the rise and fall of the stocks as the sole measure of their rights between each other.

I do not consider the evidence in this case sufficient to warrant the conclusion that there was any such agreement. There being no express agreement, and the whole evidence as to any implied agreement being derived from the account itself and the dealings of the parties, it seems to me that, in the view of the evidence most favorable to the defendants, it does not go further than to establish that it was the intention of both parties that the complainants should carry the stocks until other directions were given by either party, and while so carried Williamson should be liable only for the differences; but such mutual intention did not make a contract between them that the differences should be settled only in this manner, or that the brokers should have no right to make deliveries. I conclude, upon the whole evidence, that the defence of illegality has not been made out.

It is proper to say that had I concluded that the defence was sustained, it would not, in my opinion, have been available to protect the grantees against the whole amount of the judgment, for the following reasons: The judgment in New York was recovered on a claim for the balance due on an account stated, between the defendant and the complainants, as his brokers, for the purchase and sale of stocks in the New York Stock Exchange, and, as appeared at this hearing, the judgment in New York was recovered upon proof of this account stated and an admitted balance of $9,053.39, due on June 15th, 1899. The

account ran from March 8th, 1898, and upon the part of the brokers included, among other items, charges for moneys paid to the defendant, to the amount of $8,895, and a credit of $1,000 paid by defendant on opening the account. These payments constituted the only actual money transactions or payments between the parties during the running of the account, and leaving out of view these money payments on either side, the balance on the account stated arose from the amounts due plaintiffs for commissions on the purchase and sale of stocks by his order and for him (about $6,000) and interest charges for carrying the stocks ($2,842.88), less $1,925 credited for dividends received on the stocks while so carried. If these transactions in New York were gambling transactions, within the purview of the first section of our statute against gambling (*Gen. Stat. p. 1606*), declaring wagers unlawful, and the transactions were wagers between the brokers and customer, and the payments to the customer were payments on account of these wagers, then, under the second section of that statute, the brokers were entitled to recover the money paid. To the extent, therefore, that the judgment represents the balance due complainants for money paid, the New York judgment is not based on a contravention of our public policy, but carries it out equally against all parties. As the defendants appeal for equitable protection against the judgment, the substantial equities on the whole claim, which, so far as the brokers were concerned, was merged in the judgment, should be considered. If the transactions were in fact gambling transactions, within the purview of our statute, then so far as the property rights of both parties are concerned, which is the only kind of right with which a court of equity deals in these cases, the rule of public policy is made effective against both parties by discarding from the illegal transaction upon both sides all rights or liabilities that arise or are enforceable only as claims under the illegal contract. On the part of the brokers this would exclude the rights to commissions and interest, which claims are virtually rights to compensation or to indemnity under legal contracts of agency between principal and agent, but would

not exclude the actual money payments on either side. The statute allowing recovery of these moneys by the loser was passed for the purpose of abolishing in these cases the application of the general rule of common law *"in pari delicto potior est conditio defendentis,"* and of continuing in the loser, notwithstanding the payment to the winner, the right to the money, which, but for this rule relating to the enforcement of remedies, would still be his, as paid in violation of law. *Meech* v. *Stoner, 19 N. Y. 26 (1859).* The final actual result of the whole dealing between complainants and Williamson is that Williamson, having paid to the complainants $1,000, has received from them this amount of money, and $8,000 in addition, and in an action to recover on the account between them, which included these moneys paid to him, a judgment for an amount in excess of the money returned has been received. I think that Williamson himself could not be permitted, in any court of equity, to set up this illegality as a bar to so much of the judgment as had or might have had an actual advance of money for its basis, even if the entire series of transactions outside of this advance be rejected as involving gambling transactions. The assistance of a court of equity is afforded in these cases as a shield to defend, and not as a sword to attack or punish, and so far as the judgment debtor is concerned, even if the transactions were clearly mere wagers in differences and gambling transactions, the defence of illegality should not be considered effective except to the extent of the excess of the judgment over the amount of money actually received by the debtor from the brokers. I am inclined to think that the voluntary grantees of the debtor do not occupy any different position. If the defendants were complainants seeking the return of securities deposited for the debtor's account because the transaction was illegal, could they have relief, except upon the terms of adjusting the account for moneys actually received and paid? As complainants they must do equity, and as defendants they can set up an equitable defence so far, and so far only, as equity on the whole transaction requires.

There remains for consideration the question of the *status* of the conveyance by the debtor's wife to the defendant Mrs. Emily B. Williamson. This conveyance was made for the purpose of paying the grantee for moneys previously advanced by her to or for the benefit of the judgment debtor or his family, and the property was conveyed at a fair value. Some of these advances were for the payment of the taxes on the property in question, and other advances were made for the family expenses, for which, as between the debtor and his wife, the former was primarily chargeable, and they appear to have been made before the recovery of complainants' judgment in this state giving them a lien on the property conveyed. The character of these advances were such as to constitute them a valuable consideration for the conveyance and to make it valid even against prior creditors. The property conveyed to Mrs. Emily B. Williamson has been in fact conveyed by the debtor and his grantee in payment of debts of the judgment debtor, or in discharge of liens on the lands in question existing before the recovery of complainants' judgment, and the entire transaction of the voluntary conveyance to the judgment debtor's wife and the subsequent conveyance of a portion of it to Mrs. Emily B. Williamson thus substantially amounted to a preference of one creditor of the judgment debtor over another, both debts existing at the same time. Such preference is not illegal or fraudulent. *Seymour* v. *Wilson, 19 N. Y. 417, 421; Murphy* v. *Briggs, 89 N. Y. 446, 451; 14 Am. & Eng. Encycl. L. (2d ed.) 347; Bump Fraud. Conv. (2d ed.) 473.*

I will advise a decree declaring the conveyance to the debtor's wife fraudulent as against the complainants, and that their judgment is a lien upon the lands other than those conveyed to Mrs. Emily B. Williamson, and that as to her the bill be dismissed.