ELEANOR B. DIXON

*v.*

EMMA P. BENTLEY et al.

[Decided February 2d, 1905.]

1. Testator's will gave half the proceeds of a mortgage, in which he was mortgagee, to his son, and his son's will gave his wife a life estate in such proceeds, with remainder to his several children. During the life of the widow one of the children assigned his interest in the estate of his "grandfather," in so far as such mortgage was concerned.—*Held*, that in equity such assignment carried the child's interest in the remainder of the fund.

*2 Robbins.*                    Dixon *v.* Bentley.

2. Where the assignment of the assignor's interest as remainderman in a certain fund expressed a consideration of $550, when his interest was over $2,700 and the business of the assignee was that of lending money, and the attorneys who negotiated an assignment from the assignee to another had their attention called to the question of the probability that the assignment was merely a mortgage, the latter assignee was chargeable with notice that the assignment was merely a mortgage.

3. A remote assignee of an assignment of the assignor's interest as remainderman in a certain fund who was chargeable with notice that the assignment was originally a mere mortgage, was not entitled to recover as against the assignor the amount which he gave for the assignment, but merely the amount which it was given to secure.

4. One having an interest as remainderman in a fund held by the receiver of his father's estate, while in financial difficulties, sold his interest for $600, though its actual value was $2,700, but thereafter he encouraged the assignee to purchase another interest in the fund, relying on the belief that he had secured the remainderman's interest, and the remainderman made no objection or assertion that he had any equity against the holder of his assignment.—*Held,* that the assignee was entitled to a decree establishing his ownership to the remainderman's interest in the fund, subject to the right of the receiver to his commissions and expenses and to the right of others having an interest in the fund to be protected against any depletion of the remainder of the fund by the demand of further debts of the estate.

On petition, answers and proofs, taken in open court.

The object of the petition is to procure the payment of certain moneys in the hands of the receiver of an estate.

*Mr. William H. Speer,* for the petitioner.

*Mr. Robert S. Hudspeth,* for the respondents.

PITNEY, V. C.

The object of this suit, which was commenced in January, 1894, was to conserve the assets of the estate of Peter Bentley, second of that name, late of Jersey City, who died in 1888, and incidentally to appropriate those assets to the purposes of his will. See *Bentley* v. *Bentley, 38 Atl. Rep. 286 (1897),* and *Dixon* v. *Bentley, 60 N. J. Eq. (15 Dick.) 353.*

In accordance with the decisions therein mentioned and referred to the estate was, in March, 1894, taken from the manage-

ment and control of the executrix and widow and placed in the hands of a receiver, and has been, and still is, held and managed by him under the direction of this court.

The principal assets of the estate then immediately available were, mainly, several parcels of real estate, and some of those parcels were from time to time sold by the receiver to pay the debts of the testator. All has not been sold.

At the date of the transfer here brought in question, all the debts had not been paid.

Among the assets then not immediately available was a half interest in a bond and mortgage, originally for $147,000, but reduced by payments to $100,000, given by the New Jersey Railroad and Transportation Company to Peter Bentley, the first, who, by his will, subject to the interest of his widow, directed that it should be divided between his two children, Peter Bentley, the second, the testator herein, and Mrs. Tower. By arrangement between Peter, the second, and his sister, Mrs. Tower, the income from this mortgage, which by its terms had long been due, was vested in their mother, the widow of Peter, the first, during her lifetime.

Payment of this mortgage had been extended, at a reduced rate of interest, but was liable to be called in, after notice, I believe, of six months.

It follows that the receiver of the estate of Peter, the second, was entitled to demand and receive $50,000 out of this mortgage at the date of the death of the widow of Peter, the first, which occurred in February, 1899. The receiver duly collected this sum and devoted a portion of it to the payment of the remaining debts of Peter, the second, and, at and before the hearing herein, had in his hands a trifle over $38,000 as the net remainder of its proceeds.

For present purposes that sum may be treated as representing the mortgage in question, although it is still liable to be depleted by the successful enforcement of claims against his estate, if any remain, of which, however, there is little probability.

By the will of Peter, the second, his widow, Emma P. Bentley, now living, is entitled to the interest on that sum during her

lifetime, and at her death it goes to her seven children, to be equally divided between them.

The petitioner, Robert C. Banes, of Philadelphia, claims to be the owner of two-sevenths of this fund and entitled to an immediate payment of the same by the receiver, and prays accordingly. He claims to have purchased both the life estate of Mrs. Bentley in said two-sevenths—and this is undisputed—and also the remainder therein of her two sons, namely, Peter, the third of that name, and Richard P. Bentley.

His claim to Peter's one-seventh is as follows:

*First.* An assignment by Peter to one Frank P. Martin, dated September 2d, 1898, in consideration of $550.

*Second.* An assignment by Frank P. Martin to Frank W. Pierson, of Philadelphia, dated December 19th, 1898, in consideration of one dollar.

*Third.* An assignment from Frank W. Pierson to Robert C. Banes, trustee, dated February 27th, 1899.

*Fourth.* An assignment by Frank W. Pierson to Robert C. Banes, dated January 6th, 1900, in consideration of one dollar.

*Fifth.* An assignment by Robert C. Banes, trustee, to Charles H. Burr, Jr., dated January 22d, 1900; consideration, one dollar.

*Sixth.* An assignment, on the same day, from Charles H. Burr, Jr., to Robert C. Banes; consideration, one dollar.

Petitioner claims Richard's share by an assignment by Richard to Frank W. Pierson, dated December 15th, 1898, in consideration of one dollar and other good and valuable considerations.

This share was included in and passed by the third and following assignments just set forth.

Petitioner claims the interest of Mrs. Bentley, the life tenant, by deed of assignment dated January 30th, 1900, from her to Frank W. Pierson, acknowledged January 23d, 1900, in consideration of $5,500.

In each of these documents the subject-matter is expressed to be the mortgage of $147,000, above mentioned, and they each recite that instrument by its date, the names of the mortgagor and of the mortgagee, and the amount, and generally its terms.

Those instruments also recite the several wills of Peter Bentley, the first, and Peter Bentley, the second.

The operative part of the instrument is as follows:

"Know ye, that I, the said Peter Bentley, 3d, for and in consideration of the sum of five hundred and fifty dollars, to me in hand well and truly paid by Frank P. Martin, of the city of Philadelphia, conveyancer, the receipt whereof is hereby acknowledged, have granted, bargained, sold, assigned, transferred and set over, and by these presents do grant, bargain, sell, assign, transfer and set over unto the said Frank P. Martin, his heirs, executors, administrators and assigns, all my right, title and interest, of whatsoever kind or nature, of, in and to the estate of my grandfather, Peter Bentley, 1st, in so far as said mortgage for one hundred and forty-seven thousand dollars and the accompanying bond is concerned, given, devised and bequeathed to me in and by his last will and testatment, as above set forth, or in any other way derived from him whatsoever."

It will be observed that this language extends only to the interest in the mortgage in question derived by the assignor from the will of Peter Bentley, the first, which is fully recited, as well as that of Peter Bentley, the second, and that the will of Peter, the first, gave his whole estate to Peter, the second, and only a small legacy to Peter, the third.

The several counsel of Messrs. Martin, Pierson and Banes resorted to a title company to examine into the validity of the mortgage and guarantee the same, but all of them, including the title company, seem to have overlooked the fact that the mortgage was a part of the personal estate of Peter Bentley, the second, and therefore subject to its administration and the payment of the debts of the testator, Peter, the second, and that in law the several assignors derived nothing from the will of Peter, the first, and had, probably, no legal interest in the mortgage as such to transfer it, and that it could only be collected by his executor or his representative—in this case, by the receiver.

This apparent oversight is the more remarkable in view of the fact that all the Bentleys lived in Jersey City; the real estate of which Peter, the second, died seized was located there, some of it in the business part of the city; the principal suit herein, in all its stages in this court, was heard in that city;

the receiver lived there, and was openly in control of the estate, both real and personal, and the title company employed by the parties was located there.

The deeds of assignment above mentioned, though plainly insufficient to pass any legal interest in the mortgage in question, are, in my opinion, sufficient to transfer in equity, and upon equitable terms, the shares specified in what shall remain of the proceeds of this mortgage in the hands of the receiver, after it has by him been subjected to its proper burthen.

All this, as we have seen, has been done, and a balance remains, as reported by the receiver. He does not, however, waive his right to be heard further before any of this fund is ordered to be paid out to any person.

Mrs. Emma P. Bentley, the widow of the testator, admits the validity of her assignment, but wishes to be protected against any diminution of the remaining fund by reason of any outstanding claim against the estate.

All the other beneficiaries under the will are equally interested in that behalf.

The only immediate result of the present contest to which the petitioner is entitled is a determination and declaration of the court that he is entitled to stand in the place of the several assignors.

Peter, the third, and Richard P. Bentley, each make separate defences to their several assignments.

I shall first consider that of Peter.

His defence is that his assignment, though absolute on its face, was given as a mere security for a loan of $550, for which he gave a promissory note, payable in one month, and received a written defeasance from Martin, the assignee, which he produces, as well as one or two letters from Martin recognizing his equity of redemption, and that he afterwards, but not within the month, tendered to Martin the amount of his note, with interest, and demanded the return of his note and assignment, which was refused.

This defence is well proven in all its parts, and his statement, and that of his witness as to the facts, was not denied, although

at the hearing Martin, his assignee, was present in court and might have been called to disprove it.

The answer made by petitioner to this defence is twofold—first, that Peter gave Martin a written power to make absolute sale of his share, and that under that power he sold it to Pierson, who, in turn, sold it to Banes.

Peter's answer to this contention is—*first,* that his written authority to Martin did not authorize him to sell at the price he received, and was accompanied by conditions which were not observed; and *secondly,* that both Pierson and Banes had notice of his equity of redemption, and that neither was a purchaser without notice.

The second answer of petitioner to Peter's defence is that before Pierson took the assignment from Martin and paid him therefor, his counsel, Mr. Arthur W. Depue, of Philadelphia, and Martin, called on Peter and inquired as to the character and validity of his assignment to Martin, and that Peter admitted its validity and made no mention of his equity of redemption, and that Pierson's money was paid to Martin on the strength of that admission, and hence that Peter is estopped.

Peter denies this admission and avers, and is therein sustained by convincing evidence, that the particular interview to which Depue testified occurred a year after the payment of the money by Pierson to Martin, and shortly before or about the time that Mrs. Bentley made her assignment to Pierson, and he swears, in the most positive manner, that whenever the interview did occur he distinctly stated to Depue that he had an equity of redemption in the share and intended to enforce it.

The issues thus raised render necessary a consideration of a mass of evidence given at the hearing.

An examination of the voluminous files in the main cause which were put in evidence in this proceeding, and the opinion of this court, in *38 Atl. Rep. 286,* shows that after the estate had been taken from the possession of the executrix she and her family were reduced to decidedly straitened circumstances. The widow was hard pressed to support herself and her younger children.

Peter, the oldest son, managed to obtain his license as a lawyer and earn a living. After making a start as a licensed lawyer, in the early· part of the year 1898, he was disabled by illness, which continued for several months, and as a result became in straitened circumstances and greatly in need of a present sum of money. Early in the summer of 1898 he met a Mr. Carty, a New York lawyer, who had as correspondents in Philadelphia Messrs. Frank P. and Thomas J. Martin, the former being a conveyancer and the latter a lawyer, and who were in business together in Philadelphia, and engaged in the business of loaning money upon and dealing in expectancies and remainders, such as Peter had in his mother's estate. Carty brought Peter in contact with the Martins. In his dealing with them he stated his interest fully, fairly, furnished them with a copy of the wills of his father and grandfather and some sort of a search or statement made by some title guarantee company of Baltimore, and stated the value of his interest at something over $2,000 and proposed to borrow money on it.

He was told by the Martins that they had a client, who at that time was out of the city, and who, they thought, would loan money on it.

Peter's uncontradicted evidence of that interview is as follows:

"*A.* I saw, at this time, Mr. Martin and his brother—both of them—and told them I desired a loan of $2,500 or $3,000, and things went on, backwards and forwards and forwards and backwards, for a period of at least a month or six weeks.

"*Q.* Loan upon what?

"*A.* Loan upon this interest, this seventh interest in this mortgage; and finally Mr. Frank Martin, as well as Mr. Thomas Martin, informed me that Mr. Bickle, who was then in Maine, would return the latter part of September, and he had agreed to make a· loan, upon their recommendation, of $2,500, and perhaps $3,000; I told them at that time that I had some very pressing debts, which must be paid, * * * and they said, 'Well, I will tell you what we will do; we will make a loan to you.'

"*Q.* When you say 'they,' who do you mean?'

"*A.* Mr. Frank Martin, in the presence of Mr. Thomas Martin—both together, in their private office—'will make a loan to you for, say, thirty days, at the end of which time Mr. Bickle will return and make you this second loan; you can then pay us off and take that up.' "

And a loan of $550, at thirty days, was agreed upon.

Peter prepared an assignment, expressed on its face to be by way of mortgage. This they declined to accept, but required that it should be absolute, and prepared one in their office, as above set forth, which Peter executed, and also a note at thirty days for $550. They declined to advance the money outright at once, but retained the assignment and promissory note, gave him a check for $25 on account and referred him for the balance of his money to the New Jersey Title and Guarantee Company of Jersey City.

After that company had examined the mortgage to its content it paid him the sum of $380, which, with the $25 previously received, netted him the sum of $405, which was all that he ever received.

When his note became due payment of it was immediately pressed, and on failure to meet it his interest in the mortgage was put up at auction, in Philadelphia, November 9th, 1898. No purchaser was found and no sale made at that time. On that day Peter wrote to Mr. Thomas J. Martin a letter, which is relied upon as authority to sell at private sale. That letter is as follows:

"Peter Bentley, Attorney-at-Law,
    "Davidson Building, 259 Washington Street, Jersey City, N. J.
"Telephone 156 J. C.                              "9th Nov., 1898.

"*Thos. J. Martin, Jr., Esq., Phila., Pa.:*

"Dear Sir—As per your suggestion over the telephone this A. M. and your letter of last week, I request you to sell my interest at private sale, in case it does not bring at least fifteen hundred dollars at public auction, with the understanding that you give me ten days' notice of the highest figure you can obtain for the same, and that I have the right to redeem it, if the highest price you can obtain for it is not satisfactory to me, within said ten days.

                              "Yours very truly,
                                    "Peter Bentley."

On November 29th the Martins wrote to Peter, notifying him that one Regn had purchased his interest from Frank P. Martin, and had refused an offer of $750 for the same, and proposed to sell it at that price unless Peter chose to buy at that price. He, believing the letter to be a mere ruse to get $200 more than he owed out of him, paid no attention to it.

In the following April, 1899, he called on the Martins, at Philadelphia, with over $600 in his pocket, and offered to pay them the $550, with interest and all charges. This offer they declined to accept, because, as they said, they had already sold the same. They did not return to him the promissory note.

In the meantime Richard P. Bentley was quite as sorely pressed for money as his brother Peter, as he was still a law student, and had little opportunity to earn it. In his distress he also came into contact with Carty, who, in turn, introduced him to the Martins.

Omitting, for the present, the details of his negotiations, so far as they affect the merits of his defence, it is enough to say that Richard, on December 15th, 1898, in consideration of one dollar and other good and valuable considerations. made an assignment of his one-seventh interest to Frank W. Pierson, of Philadelphia, clerk.

On December 19th, 1898, Frank P. Martin, in consideration of one dollar and other valuable considerations, assigned the one-seventh interest of Peter to Frank W. Pierson.

That gentleman was a clerk in the office of Mr. Arthur W. Depue, a lawyer, of Philadelphia. The price actually paid seems to have been $850 for each of the shares. Mr. Depue drew his checks for those two sums—one to the order of Richard P. Bentley and the other to the order of Frank P. Martin.

Mr. Frank W. Pierson got his position as a clerk in the office of Mr. Depue at the request of another lawyer, Charles H. Burr, of Philadelphia, who was the counsel of petitioner herein, both in his individual capacity and as trustee of his father's estate. The money to pay Richard P. Bentley and the Martins was borrowed from Mr. Bane, as trustee of his father's estate, and an assignment was made, as we have seen, from Pierson to Banes, as trustee, to secure that loan.

It is quite apparent, from the whole case, that Pierson was a mere figurehead for Banes and the actual transfer was looked after by Mr. Arthur W. Depue, as counsel for Charles H. Burr, who was the counsel for Banes.

Subsequently negotiations were entered into between Depue

and Richard Bentley and Mr. Cortlandt Parker, counsel for Mrs. Bentley, for the sale by Mrs. Bentley of her life estate in the two-sevenths of the mortgage, the remainder in which had already been vested in Pierson.

These negotiations ended in an assignment, made on January 23d, 1900, by Mrs. Bentley to Frank W. Pierson, of that interest, in consideration of $5,000. paid to her, $500 paid to take up a previous loan and $500 to Richard Bentley, making $6,000 in all.

Some confusion has arisen from the circumstance that this instrument bears date the 30th of January, 1899, but it could not have been prepared as early as that because it recites the death of the widow of Peter, the first, on the 26th of July, 1899, and the previous assignment, made May 1st, 1899, to secure a loan of $500, to one Catharine L. Ashton.

It was not seriously contended that Peter's right of redemption was lost by failure to pay his note at the date it fell due, or that the maxim, *"once a mortgage, always a mortgage,"* did not apply.

I shall now go into the evidence upon which the petitioner relies to show an estoppel against Peter Bentley setting up that his assignment to Martin was by way of mortgage.

That evidence is the testimony of Mr. Arthur W. Depue, who swears that in December, 1898, while the negotiations were going on for the purchase of the two shares of Richard and Peter by Mr. Pierson, who, as already stated, was a mere figurehead for Depue and Banes, that he stated to the Martins, that while Mr. Martin handed him his deed from Peter, which was an absolute deed, still that he (Depue) wanted some confirmation in regard to that, and that he would have to see Mr. Peter Bentley. His language is this:

"I also stated to Mr. Carty, and to Mr. Martin and to Mr. Richard P. Bentley, before this settlement took place, that while Mr. Martin had handed me a deed—this deed which is in evidence—of the interest of Peter Bentley, an absolute deed, that I wanted some confirmation in regard to that, and that I would have to see Mr. Peter Bentley."

This statement is relied upon by Peter as a clear indication that Depue had reason to believe, or had learned in some way, that Martin's title was that of mortgagee only, and this is the more significant because he does not state that Martin assured him to the contrary. Besides, the amount of the consideration named in the deed, taken in connection with what seems to be a common practice in such cases, was, I am inclined to think, enough to put him upon inquiry as to whether Martin was anything more than a mere mortgagee. Moreover, if Martin exhibited to Depue Peter's letter of November 9th, 1898, as his authority to convey, that letter was of itself notice that Peter claimed the right to redeem.

Depue then proceeds to testify that he went to Jersey City with Martin and met Richard, and at that time Peter Bentley was ill and confined to his bed, and that they, Richard and his brother-in-law, Mr. Dixon, took him and Martin to a physician's house, where Peter was, and he found Peter in a third-story back room, and that he had with him a deed of confirmation which he wished Peter to execute, and asked him to sign it, and that he (Peter) answered: "I don't want to sign that deed; I have already signed away my interest; I haven't anything left; I won't sign that deed."

He further swore that he (Depue) was anxious to have the deed of confirmation signed, but that Peter persistently refused, and always gave the same reason—that he had already signed away his interest and hadn't anything left. He swore that all this took place in the presence of Martin and Richard Bentley. He said that he returned to Philadelphia and explained the situation to Mr. Pierson and Mr. Burr, who was to loan the money, and that they said that they were satisfied, and that after that the money was paid.

Now, Mr. Burr swears, on this subject, as follows:

"*Q.* Your client, Mr. Banes, furnished the money to carry out these transactions?

"*A.* He loaned $1,700 to Mr. Pierson.

"*Q.* He put up all the money, didn't he?

"*A.* Except expenses.

"*Q.* Didn't he put up all the money?

"*A.* All the money that was paid to the boys, yes, sir.

"*Q.* Didn't you have any talk with Mr. Depue about the confirmatory title of sale?

"*A.* From Mr. Peter Bentley?

"*Q.* From any of them?

"*A.* Well, you mean the one he asked Mr. Peter Bentley to sign?

"*Q.* I will change the question; did you have any talk with Mr. Depue about a *confirmatory assignment or sale on the part of the Bentleys—Peter, Richard or the widow?*

"*A.* Yes, sir; about both.

[This indicates that two confirmatory deeds were prepared.]

"*Q.* About both—when?

"*A. The first one when he came back from Jersey City, and told me that Mr. Peter Bentley had not signed it.*

"*Q. When was that, please?*

"*A. Just prior to the 19th of December, 1898.*

"*Q. Sure of that?*

"*A. Yes, sir—positive.*"

It thus appears plain that Mr. Burr, who was acting as counsel for Mr. Banes in the matter of the so-called loan of $1,700 to Mr. Pierson for the purchase of these two shares in remainder of Peter and Richard, had notice that Peter declined to sign a confirmatory deed.

Now, the evidence, on Peter's side, on that subject, is this: That in the month of December, 1898, the date in question, he was in perfect health, attending to his business in his office, which is proven, not only by the almost daily entries, made in his own handwriting, in his docket, but by the undisputed fact that on December 15th, 1898—the very day which Mr. Depue fixes as the day on which he went to Jersey City and interviewed Peter on a sick bed in a dwelling-house—he (Peter) actually signed as a witness the assignment from Richard to Pierson for his share, which instrument was also witnessed by Mr. Carty. Upon that assignment the money was paid, on December 19th, 1898, to Mr. Carty, by Mr. Depue's check, by money furnished by Burr for his client Banes.

Richard Bentley swears that he did not, at or about that time, take Mr. Depue to see his brother, as testified by Depue; that he knew his brother (Peter) claimed the right to redeem his share, and he made every practical effort to prevent him from being brought in contact with Depue for fear that he would disclose his (Peter's) claim to Depue.

Peter Bentley denies that he had any such meeting as that to which Depue testifies on or about December, 1898, but testifies that early in January, 1900, a little more than a year later, after his grandmother's death, and while negotiations for the sale of his mother's interest to Banes were pending, he underwent a surgical operation, which was his second, and while recovering from it remained at the house of his brother-in-law, Dr. Rector, in Jersey City, and was there waited upon by Depue and asked to sign a deed of confirmation, which was produced by Peter and which is dated in December, 1899, and prepared to be executed by the two boys and their mother and Mr. Pierson.

Under a great deal of verbosity, the effect of it was to cut off any equity of redemption which Richard or Peter might have. It was not executed, but the sale of the mother went through.

Mr. Depue, when confronted, on cross-examination, with the unexecuted deed of confirmation, produced by Mr. Peter Bentley, testified that the one so shown was not the one to which he referred as having asked Mr. Peter Bentley to sign. He said that the one which he presented to Mr. Peter Bentley to sign had been destroyed, and had been destroyed before the two assignments of December, 1898.

I believe that there is no positive evidence to show that either Mr. Depue or Mr. Burr saw the large advertisement or poster which the Messrs. Martin appear to have circulated advertising Peter's share to be sold at auction—the advertisement was by James A. Freeman's Sons, auctioneers, for a sale at twelve o'clock, November 9th, 1898, at Philadelphia Exchange—or that either of those gentlemen had direct information from the Martins that the share was held by the Martins as a mere security for the payment of money.

It does, however, appear, if Depue and Burr are to be believed, that Depue represented to Burr a day or two before the payment was made, on November 19th, 1898, to the Martins, that he (Depue) had asked Peter to confirm the Martins' title, and that Peter had refused. Of this Burr is entirely certain. Depue may have made this statement to Burr without having, in point of fact, said a word to Peter about it. Again, though Depue

swears, as I recollect, that he never had but one interview with Peter in order to get him to sign a deed of confirmation, yet it may be that he did have an interview with Peter in his office on or about December 15th, 1898, and did ask Peter to sign a confirmatory deed, and that a year later he asked him to sign another confirmatory deed, and on that occasion saw him at Dr. Rector's house. Perhaps that is the view most charitable to Mr. Depue. But then his statement of what Peter said to him is without any corroboration, and the language he uses in relating Peter's answer is, at the best, not entirely conclusive. On the other hand, Peter swears, in the most positive manner, that he not only refused to sign the deed of confirmation, but stated in the clearest manner that his share was only held by the Martins as collateral security; that he had an equity of redemption and intended to enforce it against the Martins, and he followed up this declaration, the next April, by raising the money, going to Philadelphia and tendering it to the Martins.

I am inclined to think that there were two deeds of confirmation prepared for execution by Peter—one in December, 1898, and the other in December, 1899—and that both were presented to him, and the recollections of the two parties concerned have become confused as to the two occasions. This tends to reconcile their evidence.

The principal question, after all, is, what reply did Peter make to Depue's application?

Now, extending to Peter the same charitable view of his evidence that I have to Depue, I am led to the conclusion that his account of the ground on which he refused to sign the deed of confirmation is the more reliable of the two, and that he did state to Depue, when he refused to accede to his request, the true ground of his refusal.

Mr. Martin, who, according to Mr. Depue, was present when Peter made this admission to Depue, was present in the court-room during the hearing, but was not called by Depue to corroborate his account of it.

Upon a careful review of the evidence bearing upon this part of the case, and considering the comparatively small sum named

as the consideration of the deed, considering that the evidence of both Burr and Depue shows that their attention was called to the question of the probability that the deed was no more than a mortgage, together with the character of the business apparently carried on by the Martins, which was mainly loaning money upon such rights, I am led to the conclusion that the petitioner is chargeable with notice that the title of Martin to Peter's share was by way of mortgage only, and therefore subject to redemption.

This renders it unnecessary to inquire, in Peter's case, whether the circumstance that petitioner is coming into a court of equity to recover on a title which is purely equitable, and is under the necessity to ask what amounts to a reformation of his title deed, is sufficient of itself to reduce his claim to a sum which the court shall deem equitable and just.

After all, the only question is whether Banes shall be permitted to recover on the basis of the amount nominally advanced by the Martins ($550) or that advanced by himself ($850) ; for, upon well-settled principles, granting him the position of a *bona fide* purchaser for value without notice, he can recover no more than he actually advanced, with interest. *Campbell* v. *Nichols, 33 N. J. Law (4 Vr.) 81* (at *p. 86*) ; *Holcomb* v. *Wyckoff, 35 N. J. Law (6 Vr.) 35; De Kay* v. *Water Company, 38 N. J. Eq. (11 Stew.) 158, 162; Mellick* v. *Mellick, 47 N. J. Eq. (2 Dick.) 86; affirmed on appeal, 48 N. J. Eq. (3 Dick.) 613; Ruckelschaus* v. *Oehme, 48 N. J. Eq. (3 Dick.) 436; Robeson* v. *Robeson, 50 N. J. Eq. (5 Dick.) 465, 466 (Court of Errors and Appeals)* ; *Haughwout* v. *Murphy, 22 N. J. Eq. (7 C. E. Gr.) 531, 547,* and cases cited (at *p. 536 et seq.*) ; *Big. Estop. (5th ed.) 644.*

In fact, but for the doctrine silently acted upon in *Putnam* v. *Clark, 29 N. J. Eq. (2 Stew.) 412; 33 N. J. Eq. (6 Stew.) 338,* and other cases scattered through our reports, I should have thought that in dealing with a right like the one here in question it was clearly the duty of the assignee from an assignee to make inquiry of all his predecessors in title for latent equities, if any, existing between the different prior owners. Such is the

rule laid down by Professor Pomeroy (*2 Pom. Eq. Jur.* § *708 et seq.*), and it is sustained by strong reasoning and weighty authority. It has been relaxed in favor of *quasi*-negotiable instruments, including, in this state, mortgages. But the reasoning which includes such instruments within its scope surely does not reach the case of a remainder in an estate subject to a life estate. This interest is in marked contrast, in respect to its negotiability, to bonds and mortgages, shares of stock in incorporated companies and other interests of a mercantile nature.

I shall advise that Peter's share shall be subject to redemption upon the basis of the payment of $550, with interest, at six per cent., from the 1st of October, 1898, to the day in April, 1899, when tender was made, and from that time on at the rate of five per cent. I shall fix the time for redemption upon settling a decree.

If he (Peter) shall see fit to redeem the same, there can, of course, be no relief granted to the petitioner as to Peter's share, except the payment out to him of the interest on that share during the lifetime of the present Mrs. Bentley. It is Peter's absolute right to have the principal fund retained in the hands of the receiver during her lifetime, and this court has no power to interfere therewith.

Any arrangement for the paying out of that share of the principal must be by agreement between petitioner and Peter. If Peter shall fail to redeem, measures will be taken to enforce the lien of the petitioner.

We come, now, to the case of Richard P. Bentley.

His defence is that being in very straitened circumstances, and having attained the age of only twenty-three years, and being engaged in the study of the law, with no means of support except odd jobs picked up in a lawyer's office, he heard that his brother, Peter, had effected a loan on his share in the mortgage so often mentioned, and so he attempted to find some person to make a loan to him on his share.

In this condition of affairs he was waited upon by Mr. Carty, who had effected Peter's loan. Carty undertook to effect the loan, but reported to Richard that, after trial, he was unable to

effect a loan, but could effect a sale at $600, and, as Richard understood, through the Martins, in Philadelphia. Richard, in his distress, agreed to sell for $600. Carty, in order to carry that out, induced him to execute the assignment to Frank W. Pierson, above mentioned, with a stated consideration of one dollar and other good and valuable considerations, and dated December 15th, 1898. The verbiage of the effective part of the assignment is, I believe, precisely like that of Peter's to the Martins, above recited. That assignment was executed on the day on which it bears date, in the city of Jersey City, in the presence of Carty and Peter Bentley as witnesses, and acknowledged on the same day before Master McDermott, and recorded on the 17th of December, in Hudson county. On the 17th Richard executed a short power of attorney to Carty to receive the money on it. This was witnessed by his friend, Mr. Appleton, of New York City.

The assignment and power of attorney were taken by Carty to Philadelphia, and on the 19th the assignment was delivered to Mr. Arthur W. Depue, on the same day and at the same time that the assignment from Martin to Pierson was delivered; Depue handed to Carty his check on a Philadelphia bank for $850, to the order of Richard P. Bentley; Carty managed, by the aid of the short power of attorney, just mentioned, and the assistance and endorsement of the two Martins, by their firm name, to obtain the cash on the check without Richard P. Bentley's personal endorsement. He returned to Richard and stated —according to Richard's account of it—that he had received the $600 mentioned as the price, charged him $100 for his services, and in that way accounted for the sale of the share. He then, out of the $500 which he admitted was coming to Richard, borrowed $40, which he has never returned, so that Richard received just $460 for property which, by the life tables, and supposing the fund was to be divided at once between him and his mother, and supposing that the whole $50,000 was involved, was worth about $3,500.

In point of fact, as afterwards turned out, the fund was reduced by the payment of debts to $38,000, so that his interest was worth about $2,700.

Carty's account is that he negotiated the sale to the Martins for $550 and reported it to Richard, and that the Martins renegotiated it to Pierson for $850, retaining for themselves $300 as a profit, and that he reported to Richard—which Richard admits—that he knew that more than $550 was actually paid for the share, and he says that he deducted, out of the $550, $110 which Richard owed him for previous services, and paid him $440 only, $10 less than Richard recollected that he received.

The result in either case is sufficiently startling, and it is not surprising to find that the English courts, by a long series of decisions, many of which are collected in *Chesterfield* v. *Janssen, 1 White & T. Lead. Cas. Eq. *541,* and also in *2 Pom. Eq. Jur.* § *963,* and notes, finally adopted, almost as a principle, the practice to set aside all such transactions, and to compel the purchaser to accept what the courts held to be a reasonable compensation.

Indeed, the English courts went so far, of late, that it became impossible to raise money on reversions and remainders, and parliament intervened, in 1868, with an act, referred to by Professor Pomeroy in a note to section 963, correcting this evil. Nevertheless, the courts held that this statute did not prevent them from administering, as of old, the general principles of equity in such cases. I may add here that apparently our own courts have never gone so far as the English courts did for the years preceding the passage of the act just mentioned.

The theory of Richard's defence was that Carty merely acted as the figurehead for Depue and Burr, acting as counsel for Banes, the petitioner. But I think his defence in that respect fails. I think that the evidence does not support the idea that Burr and Depue were colluding with Carty and the Martins, or that they were at all cognizant of or chargeable with the harsh terms put upon Bentley by those gentlemen. I think that Depue, acting for Burr and Banes, drew the check in favor of Richard in full expectation that he was to receive the money on it, and that it was, in effect, a direct transaction between Banes—Pierson being a mere figurehead—and Richard. So that Banes is not chargeable with any notice of the depletion by the intermediaries.

Further, there is no room in the case for the feature of a loan; no equity of redemption was saved.

Now, Richard's case must stand, if at all, purely on the ground that petitioner took advantage of Richard in his distress to procure from him an absolute conveyance of his interest for $850. As matters have since developed, that was about one-third of its actual value upon a division of the fund between him and his mother.

In favor of Richard are two circumstances—first, that he is not in court as the plaintiff seeking equity. In many, if not most, of the adjudged cases to which I referred the party seeking equity was the heir or remainderman, and was always put upon equitable terms; but here, as before remarked, Richard is content to let the money lie in court until his mother dies, and it is Banes who is suing in equity.

In the next place, by no construction of the petitioner's assignment, can it be held that any interest in this fund passed at law. The petitioner is, in effect, asking a reformation of his deed, and I may add that Richard is in no way responsible for this technical defect. It arose in the office of the Messrs. Martin, when Peter's assignment was prepared. They were furnished with all the material from which to draw a proper deed.

Now, let us see what equity there is against Richard in the case.

I am satisfied that one inducement on the part of petitioner, or, rather, his advisers, Burr and Depue, to buy these two shares, in December, 1898, was the hope they entertained that they might be able to extinguish the life estate by a purchase from Mrs. Bentley. Their information was that the elder Mrs. Bentley was well past eighty years of age and in feeble health, and, I think, they also had information that the younger Mrs. Bentley was in straitened circumstances. The distress of her two sons was enough to suggest that idea. In point of fact, she was very soon in Philadelphia borrowing money on her life estate of one or the other of the parties, Martin or Depue.

Negotiations were soon opened with the view of purchasing her

interest, and Richard took an active part in it in behalf of his mother. He made frequent visits to Philadelphia and called on Burr and Depue; sometimes one and sometimes the other. Quite a voluminous correspondence also took place. He also negotiated a loan for his brother, John Bentley, on his share. In all these he on no occasion uttered a word or did an act by way of repudiation of the sale of his share.

His grandmother died in July, 1899, and the fund was relieved from the very slight burden of her life estate. The mother was then ready and anxious to make a sale which would net for herself a lump sum of money and satisfy certain personal creditors. She had borrowed $500 on her share. Finally, in December, 1899, a bargain was struck, with the approval of Mr. Cortlandt Parker, the counsel of Mrs. Bentley. It was as follows: That Mrs. Bentley should receive $5,500 for two-sevenths, out of which $500 was to be paid to a Mrs. Ashton, of Philadelphia, of whom she had borrowed $500, leaving her $5,000 net, and Richard Bentley should receive, in addition, $500 for his services, making $6,000 in all.

The petitioner secured and paid $300 for a policy of insurance, called "Guaranty of Title," of the New Jersey Title Guarantee and Trust Company, of Jersey City, New Jersey, marked as guaranteed as "$14,000," and on the 23d of January, 1900, by deed, dated, by mistake, January 30th, 1899, Mrs. Bentley assigned to Pierson two undivided one-seventh parts of her estate for life in one-half of the mortgage, which one-half would be $50,000, and two-sevenths would be $14,000, and she added a power of attorney to collect the same.

Now, strange to say, as before observed, up to this time nobody, unless it be Mr. Parker, seems to have thought that inasmuch as that mortgage belonged to the estate of Peter Bentley, the second, it could only be paid to the receiver of that estate, and would be subject to the payment of any debts that remained.

I am unable to find any evidence that Richard Bentley was in any degree responsible for this remarkable oversight on the part of both the Messrs. Burr, Depue and the searcher of the title guarantee company.

It would seem that Burr and Depue expected to obtain $14,000 directly from the railroad company. In this they were naturally disappointed, the money being claimed by and paid to the receiver. But, owing to these misunderstandings, the principal money did not reach him until March 2d, 1901, nearly two years after the death of the elder widow, and more than a year after the assignment to Pierson by the present Mrs. Bentley. The railroad company also paid him interest on this sum, which he kept in a different fund. No formal notice was ever given to the receiver by the petitioner of his claim on this fund. The receiver heard of it incidentally, probably through Mr. Parker.

After paying all ascertained debts up to date, the receiver reported that there remained out of the fund a trifle over $38,000, so that the petitioner, in the end, will receive about $11,000, instead of $14,000.

The debts which so depleted the fund were mainly odds and ends of claims which the receiver had been able to hold off in order to avoid selling any more real estate, and I am by no means satisfied that Richard Bentley, or, indeed, Peter, expected the fund to be reduced as it was, so that neither of them are to blame for the delusion under which petitioner and his counsel were acting.

I am inclined to think that Mr. Parker, who was counsel for the estate, as well as for Mrs. Bentley, and quite familiar with the great difficulty which the receiver had encountered in carrying the estate along so far, was aware of the true state of affairs. I so judge from Mr. Burr's interesting account of an interview he had with him. But Mr. Parker was under no obligation to give any information to Messrs. Burr and Depue. They were dealing at strictly arms'-length, and the price which he fixed and obtained was no more than a fair one. Mrs. Bentley's share of the fund, by the life tables, was about one-half, which would be about $2,700 for each one-seventh, and about $5,500 for the two-sevenths, and the $500 which Mr. Parker insisted on Richard receiving was little enough, considering the trouble he had had, as well as the insignificant price he had received for his interest.

In all this I find no equity against Richard, except in one

respect, and that is that the petitioner purchased, and Richard knew that he purchased, his mother's interest on the supposition that he was the absolute owner of the interest of Richard in the remainder, and Richard stood by and encouraged the transaction without any objection or assertion that he had any equity against Mr. Banes arising out of the transfer of his own share. Throughout the whole transaction this position was prominent. This consideration seems to me to be of great weight and to overcome all that may be found on the other side.

I therefore feel constrained, with regret, to come to the conclusion that petitioner is entitled to the decree of this court establishing his ownership to one-seventh of the fund by reason of the assignment of Richard and that of Mrs. Bentley.

But that right must be subject to the right of the receiver for his commissions and expenses, and to the right of the other legatees to be protected against any further depletion of the remainder of the fund by the demand of further debts.

Perhaps this can be arranged by the furnishing of a substantial refunding bond.

I will hear counsel on the terms of the decree.