The complainants were appointed receivers and trustees for the Fairview Cemetery Company by order of this court dated April 20th, 1936, in a cause wherein James D. Moore, substituted administrator of the estate of Herman Walker, deceased, is complainant, and the Fairview Cemetery Company and others, are defendants.
The cemetery company was incorporated on January 15th, 1901, under an act commonly known as the Rural Cemetery act (1 Comp.Stat. pp. 372 et seq., now R.S. 8:1-1 et seq.), by Herman Walker, Henry J. Gordon, Rutherford H. Walker, George H. Dodds, Frederick Walker, Charles H.C. Durr and Arthur W. McMillan. On the same day, the cemetery company petitioned the mayor and council of the borough of Fairview, for consent to the location of a cemetery on a tract of land in the borough of Fairview, shown on a map annexed to the petition, and comprising approximately forty-three and one-half acres. On January 18th, 1901, the mayor and council, by resolution, gave its consent to the location of the cemetery. This consent is what is commonly referred to as the license or franchise for the cemetery.
In and by the certificate of incorporation the trustees elected by the incorporators were designated as Rutherford H. Walker, of the first class, to hold office for one year; George H. Dodds, of the second class, to hold office for two years; Herman Walker, of the third class, to hold office for three years.
Pursuant to a resolution of the trustees of the Fairview Cemetery Company, adopted at a meeting held on September *Page 568 
21st, 1901, the cemetery purchased from one Percy R. Oliver approximately three acres, adjoining the forty-three and one-half acre tract above referred to, for $4,000 — $1,000 in cash and $3,000 by assuming the payment of the bond and mortgage then a lien thereon in that amount.
On June 24th, 1901, the so-called Kingsland tract, comprising approximately thirty-three acres, the major part of the forty-three and one-half acres above referred to, was purchased by Herman Walker for the sum of $33,000. On October 1st, 1901, Herman Walker and his wife conveyed to the Fairview Cemetery Company the forty-three and one-half acre tract and paid to the Cemetery Company $12,000 in cash in consideration of the issuance and delivery to him of the bonds of the Cemetery Company, aggregating $240,000, payable October 1st, 1921, with interest at six per cent. per annum, payable October 1st, 1904, and semi-annually thereafter, secured by a mortgage bearing even date with the bonds, executed to the New Jersey Title Guarantee and Trust Company, as trustee. This transaction was authorized by the board of trustees of the cemetery at a meeting held on October 7th, 1901, although the papers were dated and executed October 1st, 1901.
Interest at the agreed rate was paid on these bonds to and including April 1st, 1923, since which time no payments have been made for principal or interest for or on account of the bonds.
The New Jersey Title Guarantee Trust Company assigned the mortgage on October 10th, 1912, to Herman Walker and one Rudolph F. Rabe.
Herman Walker died intestate on November 27th, 1913, and Rutherford H. Walker was appointed administrator of his estate, and on December 20th, 1933, complainant James D. Moore, was appointed by the Orphans Court of the county of Hudson, as substituted administrator in the place and stead of Rutherford H. Walker.
Rudolph F. Rabe died on September 27th, 1926, and left, as his eldest male heir, Rudolph F. Rabe, Jr. The latter never performed, or undertook, the duties of the trustee of said bond issue, and no one has been acting as such trustee. *Page 569 
Frederick Walker, one of the incorporators of the Fairview Cemetery Company, died testate on January 13th, 1922, and letters testamentary were issued by the surrogate of the county of Hudson to Rutherford H. Walker, who was removed as such executor by order of the Orphans Court of the county of Hudson on May 8th, 1936, and complainants William F. Burke and John N. Platoff were appointed substituted administrators with the will annexed of the estate of Frederick Walker.
On June 11th, 1910, the Fairview Development Company was organized under the General Corporation act by Herman Walker, David W. Lawrence, Frederick H. Zietz and Rutherford H. Walker, with a total authorized capital of $120,000, divided into 2,400 shares of the par value of $50 each.
On April 20th, 1936, by order of this court, in a cause entitled "James D. Moore, substituted administrator of the Estate of Herman Walker, deceased, complainant, and Fairview Development Company, defendant," the complainants herein, James D. Moore, William F. Burke and John N. Platoff were appointed receivers of the Fairview Development Company.
In the bill filed herein, complainant James D. Moore, as substituted administrator of the estate of Herman Walker, and complainants, William F. Burke, John N. Platoff and James D. Moore, receivers and trustees of the Herman Walker Realty Company, and complainants, William F. Burke, John N. Platoff and James D. Moore, receivers of Fairview Development Company, and complainants, John N. Platoff and William F. Burke, as substituted administrators with the will annexed of the estate of Frederick Walker, deceased, were made parties defendant. To this apparent conflict of interests as to complainants in their representative capacities, objection was raised, but subsequently withdrawn.
By deed dated October 1st, 1910, the Fairview Cemetery Company conveyed all of the unsold cemetery property, then owned by it, to the Fairview Development Company, and at the same time the development company entered into a written agreement with the cemetery company, dated December 8th, 1910, which recites the conveyance for the express consideration *Page 570 
of $360,000 — $120,000 in cash and $240,000 by the assumption of the existing mortgage, securing the issue of bonds referred to above. Under this agreement, the cemetery company was to sell burial plots for actual burial purposes, receive the purchase price therefor, and report the sales and the price at the end of each month to the development company, and pay to the development company sixty per cent. of the gross price of the sales, and the development company agreed to obtain releases from the mortgage for the lots sold and convey such lots to the cemetery company so that it might deliver its deed to its purchasers. This arrangement continued down to the time of the appointment of the receivers. It appears that the development company, at the time of the delivery of the deed, paid to the cemetery company $109,000 in cash — $11,000 of bonds of the cemetery company (part of the issue above referred to), and thereafterwards paid an additional sum of $5,000 in cash to the cemetery company. Large sums of money have been paid by the cemetery company to the development company, which have been expended by the latter company for various purposes.
After the appointment of complainants as receivers and trustees of the cemetery company, they spent considerable time in endeavoring to ascertain the rights of the various parties, particularly the rights of the various corporations and estates, for which they were also acting in a representative capacity.
The bill questions the validity of the bond issue, and prays that the amount due thereon from the cemetery company, as well as the persons to whom the same is due, should be ascertained; that the conveyance to the development company be set aside and the agreement between the development company and the cemetery company be canceled, and that it be determined what, if anything, is due from the cemetery company to the development company, and who are the holders of the shares of the capital stock of that corporation.
Of the $240,000 of bonds originally issued, $80,000 are now held or claimed to be held by the Fairview Development Company; $53,500 are now held by the cemetery company, presumably as part of a perpetual care fund. *Page 571 
With the charges of mismanagement made in the various suits and proceedings, wherein the receivers and trustees of the corporations, as well as the administrators of the several Walker estates, were appointed, we now have no concern. The affairs of the various companies, and of the several estates, are considerably involved and much interwoven.
Several distinct issues are involved in this suit, the first of which is the validity of the $240,000 of bonds of the Fairview Cemetery Company.
The cemetery, and the conduct of its affairs, is a trust, a charitable or public trust. Atlas Fence Co. v. West RidgelawnCemetery, 110 N.J. Eq. 580; 160 Atl. Rep. 688. Those who administer the affairs of a cemetery are in reality trustees, and are subject to all of the rules of law, respecting the duties and liabilities of a trustee. It is contrary to the policy of our laws, not only because of the trust relationship, but also because of the sacred character of the cemetery as a public trust that the trustees should be permitted to make for themselves a profit.
The statute itself precludes anyone from making a profit in the operation of the cemetery. The moneys collected by a cemetery company, such as this, consist almost exclusively of the proceeds of the sale of lots and plots. Such moneys are by statute to be applied to only two purposes: (a) the payment of the purchase-money of the lands acquired by the cemetery; and (b) the preservation, improvement and embellishment of the cemetery grounds and the avenues and roads and the incidental expenses of the cemetery establishment. At least one-half of the proceeds of such sales of plots or lots is to be first appropriated to the payment of such purchase-money of the lands acquired. 1 Comp.Stat. p. 375 § 10, now R.S. 8:2-11.
In a trust of this character, a cemetery, there are three parties or sets of parties: (1) the cemetery association itself; (2) its creditors, including those to whom it is indebted for the purchase price on its lands, and (3) the owners of burial lots and plots, all of whose rights and interests must be protected by this court.
The bonds were all issued to Herman Walker at or about *Page 572 
the time of the conveyance to the cemetery company, and the most that he would be entitled to was a lien by way of mortgage or otherwise for the value of the lands for cemetery purposes.Fidelity Union Trust Co. v. Union Cemetery Association,102 N.J. Eq. 100; 139 Atl. Rep. 706.
The instant case differs from cases such as Attorney-General
v. Linden Cemetery Association, 85 N.J. Eq. 501;96 Atl. Rep. 1001, and Dennis v. Glenwood Cemetery, 96 N.J. Eq. 399;130 Atl. Rep. 375. In those cases there was no evidence of any fraud in the transaction; here, there was. The cemetery company had determined on the lands to be assigned for the cemetery; this included the so-called Kingsland farm or tract, over seventy-five per cent. of all the lands to be assigned. Herman Walker, one of the trustees, and in fact the president, purchased these lands in his own name for $33,000, and then conveyed this tract, together with approximately ten acres of his own, to the cemetery company for $228,000, a profit of over $150,000. This was a fraud, at least as to those of the general public who did, or would, purchase lots and plots, and whose money was or would be used to pay this profit.
Walker did not procure the cemetery franchise or license, or rather the consent of the municipality, for the location of the cemetery. This was obtained by the cemetery company itself. He had done nothing toward the laying out, embellishment or adaptation of the land for cemetery purposes. When the cemetery company acquired the lands they were unimproved. Approximately ten acres of the forty-three and one-half acre tract were owned by Herman Walker before the incorporation of the cemetery. When he obtained title to them is not in evidence; nor does it show what he paid for them. The entire tract has been valued by experts, produced on behalf of the complainants, at $50,298; and by defendants' exports, at $61,217.
Herman Walker is entitled to payment for the moneys advanced by him, the risk which he took in making the purchases, and compensation for his investment and assembling. A fair figure would be the amount placed on the land by defendants' experts. While interest on the money invested *Page 573 
by him in the purchase of the land must be taken into consideration, it must be borne in mind that he and his assigns have received interest on the full principal amount of the issue of $240,000 of bonds for over twenty years.
As pointed out above, the bonds were issued in consideration for the conveyance of the lands and $12,000 in cash — or, taking the value of lands at $61,217, and adding thereto the $12,000 in cash, the bonds at the time of their issuance represented a total value of $73,217.
I believe, therefore, that the bondholders, except those to whom I will hereafter refer, were entitled to $73,217, plus interest at six per cent. from the date of their issuance to the date of payment, less whatever sums of money have been paid by the cemetery company for principal or interest.
Some of the bonds are now held by persons other than Herman Walker, and the Walker interests. As to the administrators of the estate of Herman Walker, the bonds held by them are subject to the same equities as though held by Herman Walker. Those held by the Herman Walker Realty Company are also subject to such equities, as also are those held by the administrators cumtestamento annexo of the estate of Frederick Walker. The bonds held by the trustee in bankruptcy of Rutherford H. Walker are likewise subject to the same equities. As to the bonds now in the hands of third parties, a different situation arises.
Some of the defendant bondholders have raised the defense of laches. The pertinent facts are: the bonds were dated October 1st, 1901; they were due October 1st, 1921, and interest was paid to April 1st, 1923. No action was ever taken by the bondholders looking to the enforcement of their rights. There is nothing to show when the first sales of lots and plots were made to persons other than the bondholders and the organizers of the cemetery, their families and associates. Nothing has been done by the lot and plot owners to question the validity of the bond issue, or the amount actually due thereon.
The bond and mortgage securing the same constitute a lien or claim for the unpaid balance of the purchase price, on one-half of the proceeds of sales of burial lots and plots. *Page 574 Fidelity Union Trust Co. v. Union Cemetery Association,104 N.J. Eq. 326; 145 Atl. Rep. 537. The rights and powers of the cemetery company, and its liabilities, are clearly defined by the statute. A purchaser in the open market has notice, because of our statutes, that the power of the cemetery company to issue such evidence of indebtedness is limited and he, therefore, is put on notice to inquire as to the bona fides of the transaction and as to the facts on the issuance of the bonds and the purpose for which they were issued. It should also be remembered that the mortgage securing the bonds was referred to in the bonds. It was a matter of record, as was also the deed from Walker to the cemetery company, and it was evident from a mere inspection of the record that the bonds were issued partly at least for the purchase price of the lands.
As against the cemetery company, perhaps, no laches can be set up. The cemetery company was under the control of the bondholders and any delay on its part can be readily understood and should be excused.
As to the plot owners, however, a different situation arises. They ultimately will be affected by the lien of the bonds and the amount payable thereon. It was their duty to have contested the validity of the bonds, or to have made an attempt to have had determined the proper amount for which the bonds were enforceable. The records of the conveyances to the cemetery company and the mortgage were matters of record; of this, they had constructive notice, at least. It was within their power to obtain control of the cemetery through the election of trustees. They have done nothing, and because of their inaction, the rights of bona fide purchasers for value have intervened.
Mere lapse of time does not constitute laches. There must be something more — either loss of evidence, a change of position, or the court must be satisfied that because of the lapse of time it cannot feel confident of its ability to ascertain the truth now as well as it could when the subject for investigation was recent, and before the memories of those who had knowledge of the material facts have become faded and weakened by time. Lutjen
v. Lutjen, 64 N.J. Eq. 773; *Page 575 53 Atl. Rep. 625; Soper v. Cisco, 85 N.J. Eq. 165;95 Atl. Rep. 1016; Massie v. Asbestos Brake Co., 95 N.J. Eq. 298;126 Atl. Rep. 669; Wilson v. Stevens, 105 N.J. Eq. 377;148 Atl. Rep. 392; Cocheu v. New Jersey General Security Co., 128 N.J. Eq. 64; 15 Atl. Rep. 2d 124. Here, there has been no loss of evidence. However, because of the lack of vigilance on the part of the lot and plot owners, there has been a change of position on the part of subsequent purchasers of bonds. They have bought and paid a higher price for the bonds than the amount for which they were actually enforceable.
Laches may work, or create, an estoppel; its essence is estoppel. Wilson v. Stevens, supra; Lutjen v. Lutjen,supra. This is particularly true, where, as in the instant case, the laches consist of lapse of time coupled with a change of position. Such estoppel extends only so far as may be necessary to protect from loss the party entitled to assert it. He may claim indemnification, but not profit. Robeson v. Robeson,50 N.J. Eq. 465; 26 Atl. Rep. 563; Dixon v. Bentley, 68 N.J. Eq. 108; 59 Atl. Rep. 1036; Thompson v. Williamson, 67 N.J. Eq. 212; 58 Atl. Rep. 602; Hill v. Hill, 79 N.J. Eq. 521;82 Atl. Rep. 338.
Consequently, the bonds in the hands of the innocent purchasers for value should be deemed to be worth only what they paid for them, or the par value, whichever is the lower, plus interest, less what has already been paid.
It is my opinion that there should be a reference to determine who are the holders of these bonds, the purchasers for value without actual notice, the amounts they paid for their bonds, the amount of interest to which they are entitled and the amounts of moneys that they have received by way of principal or interest.
During the operation of the cemetery it appears that holders of bonds were given preferential treatment in the purchase of plots. They were allowed to purchase lots and plots for one-half of the list price; and bondholders did so purchase, and made a profit on sales. They had no right to make a profit out of the operation of the cemetery any more than could the trustees, or the organizers, or the promoters. *Page 576 
They are entitled to the return of the moneys they invested in the lots and plots, together with a fair allowance by way of interest.
There should be a reference, therefore, to ascertain what bondholders have so purchased lots and plots at a reduced price, the interest to which they are each entitled, and the amount of profits made by each. The amount of profit so made should be credited on the amounts due on their bonds.
The transaction with the Fairview Development Company was clearly improper. It was patently an attempt to make a profit. There is no difference between such a scheme and the scheme set up in East Ridgelawn Cemetery Co. v. Frank, 77 N.J. Eq. 36;75 Atl. Rep. 1066, which was condemned in that case. Indeed, a somewhat similar agreement came before this court in the case ofFidelity Union Trust Co. v. Union Cemetery Association,supra, wherein Vice-Chancellor Backes said:
"When the cemetery was about to collapse the Stuyvesant company undertook to sell its lots and plots, and to that end the cemetery association converted to it the cemetery, or a part of it. The outlay of the Stuyvesant company, if any, was in the performance of its contract and not in the enhancement of the cemetery value. The Stuyvesant company still holds the fee to the cemetery and action should be taken to restore the title."
Vice-Chancellor Backes' opinion in the quoted case serves as a precedent here and will be followed; consequently this transaction will be set aside, and I will direct the Fairview Development Company, or its receivers, to reconvey to the cemetery all of the cemetery lands to which it still retains title; and the agreement between the development company and the cemetery company should be canceled. However, while those who originated the development company intended to make a profit on the cemetery, at the same time, it must be remembered the cemetery company was hard pressed for money, and the advancement of the money by the development company to the cemetery company no doubt saved the latter from failure, and it is not equitable that the cemetery company should have both the lands and the moneys. The *Page 577 
development company, therefore, is entitled to be reimbursed for the amount of moneys which it advanced to the cemetery company, with a reasonable return on the moneys advanced, in the form of interest.
For this purpose, there should also be a reference to determine the amount of moneys actually advanced by the development company to the cemetery company, and the amounts of moneys which have been repaid by the cemetery company to the development company, allowing to the development company interest on unpaid balances and allowing also to the development company moneys which it had expended for the cemetery company in the shape of interest on its bonds; but there should not be allowed to the development company any moneys which it paid for taxes, since these taxes were imposed because of the attempt of the originators of the scheme to make a profit. The reference should also determine who is the owner of the shares of stock issued by the development company and the amount to which each is entitled by way of return of capital originally invested and interest thereon.
It may be objected that there are some innocent purchasers for value of the stock of the development company, but this we cannot conceive to have any weight. The purpose of the scheme and the formation of the development company was so patently an attempt to make a profit that no purchaser of the development company stock could claim to be an innocent purchaser for value without notice. Each of them must have bought with his eyes open.
As to the payment of the several sums found due to several holders of bonds and to the development company — the chief source of moneys available for the payment of the purchase price of the lands, is the sale price of the lots and plots. The statute requires at least one-half of the sale price of the lots and plots to be applied to the purchase price of the lands. I direct, therefore, that one-half of the proceeds of sales of lots and plots shall be set aside for the payment of the amount due to the various bondholders with interest; the interest, however, not to be computed on the amount found due to them which would include both principal and interest, but *Page 578 
only on the amount of principal found due. The development company must have no share or participation in this fifty per cent. of the proceeds of sales until the bondholders are paid in full. The payment of the amount due to it must be made out of the balance of the proceeds of sales, plus other income, after first deducting a reasonable percentage for a perpetual care fund, and the amount necessary for the orderly conduct of the affairs of the cemetery, for the administration by the trustees.
There should be a reference to compute the percentage to be set aside for the perpetual care fund, and the amount necessary to be retained by the cemetery for such costs and charges.
The bonds held by the cemetery company in its perpetual care fund, or otherwise, should be canceled. It is apparent that, no matter what sum these bonds shall be determined to be worth, it must be paid by the cemetery, and it would serve no useful purpose for the cemetery company to pay itself.
At the hearing the court orally approved the proposed settlement between the United States government and the receivers respecting the former's claim for income taxes against the development company and the cemetery company for the years 1926 and 1934, inclusive, and the interest and penalties thereon.
The receivers of both companies should take whatever steps are necessary to effectuate the settlement, including the making of the formal offer to the government, if that be necessary.
On the reference to determine what amount is due to the Fairview Development Company, there should also be determined the amount, if any, to be paid by the cemetery company towards the settlement with the government.
The amount to be paid to the government will be paid in the first instance by the development company, if the receivers have sufficient funds therefor, otherwise, the money will be paid by the receivers of the cemetery company, and the amount for which the development company is chargeable, will be allowed to the cemetery company.
In the event it becomes necessary to make payment of the amount due to the government in installments, the *Page 579 
receivers of the cemetery company, or the development company, whichever company will make the payment, will be authorized to agree with the government, and to pay the amount of interest on the deferred payments.