SAMUEL H. PINE, appellant,

*v.*

CORDELIA MARY GARDNER, respondent.

[Decided May 14th, 1928.]

1. He who, without adequate excuse, delays asserting his rights until the proofs respecting the transaction out of which he claims his rights arose are so indeterminate and obscure that it is impossible for the court to see whether what is asserted to be justice to him is not injustice to his adversary, has no right to relief.

2. Where a stepfather, who claimed that the farm in question was purchased by him and title taken in the name of the stepdaughter, brought his bill for relief some nine years after the alleged claim matured, and material witnesses have died, and the court is unable to determine with reasonable certainty,. from the testimony before it, what the truth might have been, *held*, that the bill brought by the stepfather was properly dismissed.

---

On appeal from a decree·of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

"Complainant claims that a certain farm—the subject of controversy herein—was purchased by him and that title to the farm was taken in the name of defendant to secure her against certain liabilities then incurred by her. Defendant denies this and claims that she purchased the farm with her own money, and with the distinct understanding between her and complainant that the farm was to belong to her. She says that her primary purpose in making the purchase was to afford a home for her mother and complainant. Complainant is defendant's stepfather; his wife, now deceased, was defendant's mother. She says that the arrangement was that she would allow complainant and his wife to occupy the farm so long as he paid the taxes against the farm and interest on the mortgages which she executed to raise the money to enable her to make the purchase.

"No writing exists to disclose a separation of the legal and equitable titles. Complainant's claim to an equitable title rests wholly in parol. The title necessarily vested as of the date of the conveyance to defendant; the prior and subsequent circumstances covered by the voluminous record are of value only to shed light on the conflicting testimony of the parties as to their parol agreement at the time the purchase of the farm was consummated.

"The farm—known as the 'Mason Farm'—was purchased in July, 1910, from the executor of the Mason estate for $1,800 in cash. Admittedly the idea of purchasing the farm was first conceived by complainant. He tried to borrow the necessary money, $1,800, from one Beakley for whom he worked as a farm hand, and could only offer Beakley as security for the loan a mortgage on the farm which he sought to buy for its full purchase price. Beakley deemed the security inadequate and refused the loan. At that time complainant and his wife occupied a property owned by defendant and known as the 'Blenheim property' and paid defendant a rental of $5 per month. Defendant's claim is that when she learned that her mother and complainant desired to move from her Blenheim property and to occupy the Mason farm, and that complainant could not borrow the money to buy it, she agreed to buy it and allow them to occupy it so long as they paid the taxes and the interest on the mortgages she would be obliged to execute to procure the money to make the purchase. She was to pay $100 cash and procure the remaining $1,700 of the purchase price by executing a mortgage for $500 on her Blenheim property and a mortgage of $1,200 on the Mason farm when purchased. Mr. Beakley was willing to loan $1,700 on those proposed two mortgages—one for $500 the other for $1,200.

"Mr. Beakley did not come in personal contact with defendant, but appears to have understood through his contact with complainant that the purchase was being made in behalf of complainant, and that in the event of complainant paying off the $500 mortgage on defendant's Blenheim property he would become the owner of the Mason farm. He says that he suggested to complainant that the deed be made to de-

fendant. His testimony is: 'I never thought that Mr. Pine [complainant] would pay for this farm, to tell the truth, and I thought it would save her that much trouble in case she would have to take the farm she would have title to it until such times as he paid for it.' It will be observed, however, that Mr. Beakley did not get these ideas from defendant, and the admissibility of that testimony is more than doubtful. One Ayres, a conveyancer, since deceased, consummated the transaction.

"Thus it will be observed that the entire $1,800 which was used to purchase the property now in controversy was procured by defendant and was procured wholly on her credit. That is to say, the $100 cash was borrowed by her from a friend because her money in bank was on a time account; the $500 was borrowed on her bond secured by her mortgage on her Blenheim property; the $1,200 was borrowed on her bond secured by a mortgage made by her on the property purchased at the time title was made to her. If it could be said with certainty that the $100 cash was a loan from defendant to complainant, and that the $500 proceeds of the mortgage on defendant's Blenheim property and the $1,200 proceeds of her mortgage on the property purchased were also loans of money from defendant to complainant, a resulting trust could arise in behalf of complainant as the person whose money purchased the farm; but the evidence does not support that view, and that contention does not appear to be made. The contention is, as I understand it, that the deed was made to defendant as security—in the nature of a mortgage of $500 from complainant to defendant—to the end that should complainant discharge the $500 mortgage he would become entitled to a deed. In the bill this agreement is referred to as a 'trust,' and no suggestion of protection of defendant from liability on her $1,200 mortgage bond is made.

"Defendant's claim is that complainant and his wife were occupying her Blenheim property practically as a gratuity from her, and that she wished to sell the Blenheim property [it was thereafter sold] and place complainant and his wife on the newly-acquired property in essentially the same manner as they occupied the Blenheim property.

"It transpired that later the taxes and mortgage interest became in arrears and the mortgagee, Beakley, was pressing for his interest, when relief was found by the two mortgages being taken over by Mrs. Bird, an aunt of defendant's. Later, lots were sold from the farm and the proceeds of the sales applied to satisfy taxes and interest, and, eventually, the two mortgages were wholly discharged by proceeds from the sale of lots from the farm. The $500 mortgage was thus discharged in 1916. In some instances the money received from the sale of lots which was not used to discharge taxes or mortgages were received by defendant, and in many cases, especially later, by complainant. Defendant claims that complainant was her agent in the sale of lots, and explains her acts of signing deeds when she did not receive the proceeds, and her failure to press her claims for money which complainant had received by the claim that her mother urged her not to make trouble. Complainant excuses his conduct in permitting defendant to receive proceeds from the sales of lots and his long delay in asserting his claims to a similar cause— that is, that his wife did not want him to make trouble. Defendant also claims that complainant agreed to open an account in bank in the name of defendant and deposit the proceeds of sales of lots in that account. The account was thus opened by complainant and two small deposits were so made. Complainant denies the agreement and explains the account as a gratuity. Indeed much that each party has stated is in turn denied by the other. The search for truth has thus become almost hopeless.

"After hearing the testimony of the several witnesses and enjoying the benefits of able briefs of counsel and carefully reading a transcript of the testimony, I am impelled to say that I find myself unable to determine with what I deem reasonable certainty what the truth may be touching the claims of the respective parties.

"In this situation it cannot be overlooked that complainant did not supply any part of the purchase price of the property, and that the uncertainty of his claim primarily arises from his negligence in failing to procure some written evidence of his alleged interest in the land; and that his long

delay in bringing this suit has occasioned the loss of the testimony of several witnesses whose testimony obviously would have been of great benefit in ascertaining the truth.    Mr. Ayres, who drew the original papers and conducted the transaction is now dead.    The husband of defendant, who joined with defendant in the two mortgages and who appropriately would have been a party to an engagement to reconvey is now dead.    Mrs. Pine, the mother of defendant and wife of complainant, whose attitude in this matter has been the mutual excuse of the parties for much of their conduct, is now dead.    Mrs. Bird, aunt of defendant, who took an assignment of the two mortgages, is now dead.    Each of these could have shed much light on the essential inquiry.    Complainant has long known that defendant has disputed his claim and no adequate excuse appears for his long delay in asserting his rights in court.    If his claim is well founded his rights matured in 1916.    The bill was not filed until 1925.    The rule in such circumstances, as defined in *Soper* v. *Cisco, 85 N. J. Eq. 165, 174,* is: 'The general rule is well settled that he who, without adequate excuse, delays asserting his rights until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure that it is impossible for the court to see whether what is asserted to be justice to him is not injustice to his adversary, has no right to relief.'    Citing *McCartin* v. *Traphagen, 43 N. J. Eq. 323;* affirmed, *45 N. J. Eq. 265.*    In *Lutjen* v. *Lutjen, 64 N. J. Eq. 773, 781,* the rule is stated as follows: 'Lapse of time alone is deemed by the authorities to be a sufficient ground of estoppel in cases like the present, when the court cannot feel confident of its ability to ascertain the truth now as well as it could when the subject for investigation was recent and before the memories of those who had knowledge of the material facts have become faded and weakened by time.    To constitute estoppel of this description it is not essential that any actual loss of testimony, through death or otherwise, or means of proof or changed relations, to the prejudice of the other party, should have occurred.    But the estoppel arises because the court cannot, after so great a lapse of time, rely upon the memory of witnesses to reproduce the details that

entered into the final execution of the instrument of settlement.'

"I will advise a decree dismissing the bill. Since defendant by her answer has made no claim against complainant for the money he has received, no relief of that nature can be awarded."

*Mr. Alexander L. Rogers,* for the appellant.

*Mr. Grover C. Richman,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Leaming.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, DEAR, JJ. 14.

*For reversal*—None.