Complainants seek an accounting based upon rights which they claim to have acquired by virtue of two separate written agreements, designated as Agreements "A" and "B" respectively, the execution of which resulted from the following transactions:
On February 28th, 1899, Patrick H. Flynn on behalf of a syndicate, of which complainant Fred C. Cocheu is the sole survivor and some of the deceased members of which are represented by the other complainants herein, entered into a written contract with the mayor and aldermen of the city of Jersey City whereby he, among other things, agreed to construct, on or before August 28th, 1901, a new system of *Page 65 
water works, capable of supplying 50,000,000 gallons of pure and wholesome water a day, together with such water rights, reservoir sites and easements as may be necessary in order to enable it to divert and use 70,000,000 gallons of water daily. To secure the performance of this contract Flynn executed and delivered to Jersey City a surety bond in the sum of $500,000. In addition to giving the municipality the right to relet the completion of the work in the event of its construction being unreasonably delayed or abandoned by Flynn and also an option to purchase the water works for $7,595,000 provided it, within one year of the date of the contract, gave notice of its intention to exercise that option, the contract rendered him liable for the payment to the city of liquidated damages in the sum of $500 for every day that the completion of the work was delayed beyond the prescribed period.
On May 2d 1899, Flynn assigned the contract to defendant Jersey City Water Supply Company (hereinafter referred to as "Supply Company") and, in consideration therefor, received 9,993 shares of its capital stock of the par value of $100 each, and also then agreed with it to construct the water works for the sum of $6,500,000, payment of which was to be made to him, from time to time, by means of its bonds.
Although the contract with Jersey City specified August 28th, 1901, as the date for the completion of the water works, Flynn and his associates, because of lack of funds, had not up to February 2d 1902, completed even one-fifth of the project. The Supply Company then, too, was unable to pay the large sums of money which it owed to subcontractors, materialmen and others who furnished labor or materials in connection with the prosecution of the construction work, nor the sum of approximately $450,000 which it still owed to the Security Company on account of certain water rights which had been acquired from it. Their financial straits were rendered more acute by the ever mounting liquidated damages which, in accordance with Flynn's contract with Jersey City, commenced to accrue on August 29th, 1901, at the rate of $500 per day and, by February 14th, 1902, aggregated the sum of $85,000. *Page 66 
Confronted with the impossibility of being able to borrow money with which to complete the water works, and thereby terminating the further accruals of liquidated damages, Flynn and his associates were faced not only with the loss of whatever money they had already invested in this enterprise, but also with a very substantial liability to Jersey City for the breach of its contract with them. Hence, after his request for a loan had been declined by the Security Company, Flynn commenced and carried on negotiations with it which, on February 14th, 1902, culminated in the execution of the hereinabove mentioned Agreements "A" and "B."
By Agreement "A" which was made between him and the Security Company, Flynn agreed, among other things:
"* * * to sell and transfer and convey, or procure to be transferred, sold and conveyed to the Security Company, or its nominees, immediately, all the shares (being 10,000 shares) of the stock of the Jersey City Water Supply Company * * * and all the bonds (being $6,600,000 in par value) issued by said company and all railroad, quarries, water rights and contracts, and all other real and personal property which were acquired or held for the enterprise of providing a water supply for Jersey City * * *."
By that agreement he also undertook and agreed to procure and deliver the written resignations of all the officers and directors of the Supply Company, and to deposit these, together with the bonds, the certificates of stock and the conveyances of the other property which, under the said agreement, was to be conveyed, in escrow with the New Jersey Title Guarantee and Trust Company (hereinafter referred to as "Trust Company"), who was to hold all of said instruments and documents until April 1st, 1902, subject to the proviso, however, that if Jersey City should, on or before March 15th, 1902, extend the time for the completion of the water works until January 1st, 1904, and in addition thereto waive any and all penalties and liquidated damages which may have accrued for all prior delays, then and in that event it should deliver all of them to the Security Company upon the latter paying it, as consideration therefor, the sum of $1,200,000. After using so much of this sum as was necessary for the purpose of redeeming the hypothecated bonds of the *Page 67 
Supply Company, the Trust Company was required to pay over to Flynn the balance thereof.
Agreement "B" was made between the Security Company and Patrick H. Flynn, John McCarty, Fred C. Cocheu and Michael J. Coffey, the last three persons named being three of the six members who were interested with Flynn in the Jersey City contract. After setting forth that the Security Company holds a contract "for the purchase of all the bonds amounting to $6,500,000 and all the shares of stock amounting to $1,000,000 of the Jersey City Supply Company and for the other property mentioned in Schedule "A" thereunto annexed," the said agreement provides that the Security Company should procure, if practicable, at the price and within the time therein specified, certain rights and privileges relative to the withdrawal of 70,000,000 gallons of water per day from the Rockaway river, and by its provisions the Security Company further agreed, among other things:
"(a) To procure a contract from the East Jersey Water Company whereby the latter agrees to deliver water to the city of Jersey City until the completion of the new water works.
(b) To raise, within fifteen days from the delivery to it of the property under Agreement "A" the sum of $3,280,000, and, from time to time, furnish it to the Supply Company for the purpose of enabling the latter to pay certain of its specified debts, including those subsequently incurred in the ordinary course of its business, as well as the $450,000 which was given by Flynn to the Security Company for certain land and water rights which Flynn should, upon the payment of said note, forthwith grant to the Supply Company.
(c) To cause the Supply Company to proceed with the work under its contract for the supply of water to Jersey City, and to prosecute the same diligently to completion, before January first, nineteen hundred and four, or as near to completion as the remainder of said sum of $3,280,000 after the above payments have been made, will carry the same.
(d) To sell on the first day of March, 1904, to Flynn, Cocheu, McCarty and Coffey all of the bonds and stock of the Supply Company, as well as all of the other assets transferred under Agreement "A," so far as such assets should not have been consumed in the enterprise, for $6,255,000."
In and by that agreement it was further provided that in the event that Flynn, Cocheu, McCarty and Coffey defaulted in the payment of the $6,255,000 note, which they gave to *Page 68 
the Security Company under the terms thereof, when it became due on March 1st, 1904, or failed to satisfy the indemnity bond which they had given it to secure any advances which it might make over and above the sum of $3,280,000, then and in any such event, the Security Company might, at any time within six months after its due date, cancel the said note, "whereupon, this agreement to sell to the second party said bonds, shares and property shall be void, and the right of purchase under this contract shall be void, and the right of purchase under this contract shall be at an end."
All of the conditions, subject to compliance with which the hereinabove mentioned instruments and documents were held by the Trust Company, having been complied with and the $1,200,000 payment having also been made by the Security Company, the Trust Company thereupon transferred all of said instruments and documents to the latter.
Thereafter the Supply Company, under the supervision and by means of the money supplied to it by the Security Company, proceeded with and completed the construction of the water works. On October 23d 1903, the Security Company made demand upon Flynn, McCarty, Coffey and Cocheu for the repayment to it of the sum of $287,029.99 which it had up to then supplied to the Supply Company in excess of the $3,280,000 specified in Agreement "B." On December 22d 1903, the Security Company again made demand upon them for the repayment to it of the sum of $542,537.31 which it had up to then furnished to the Supply Company over and above the aforesaid $3,280,000. On January 22d 1904, the Security Company notified these individuals that their $6,255,000 note would become due on March 1st, 1904, on which day payment thereof would be required by it, and that on January 30th, 1904, it would also require them to make payment of the sum of $631,392.20 which it had already furnished to the Supply Company in excess of the aforesaid $3,280,000.
Neither the $6,255,000 note nor the $631,392.20 hereinabove mentioned having been paid in accordance with its notice and demand, the Security Company, by a resolution of its board of directors adopted on June 27th, 1904, canceled *Page 69 
the note, and on the same day informed these individuals that it, in accordance with the terms of Agreement "B," had exercised its option to cancel the note and had left it, duly canceled, at the First National Bank of New York, subject to their joint order.
Thereafter the Security Company, from time to time, supplied additional money to the Supply Company, and by means of which the latter was enabled to proceed with and in November, 1904, complete the construction of the water works at an expenditure of $5,017,537.31, the whole amount of which, aside from the $1,200,000 paid by it to the Trust Company under Agreement "A," was supplied by the Security Company between April, 1901, and January, 1905. Shortly thereafter, Jersey City brought suit for the specific performance of its contract, and after the conclusion of which litigation the water works was conveyed to that municipality on October 10th, 1911, and at which time it paid the Supply Company the sum of $6,992,000.
In the light of these developments, complainants, on May 5th, 1926, filed their bill for an accounting and in support thereof now claim that the transaction set forth in Agreements "A" and "B" should be construed and held to be a loan and a pledge of the property therein involved, and not a sale thereof as contended by defendants. As to the issue thus raised no determination need be, and therefore none is, here made. In this connection it is, however, worthy to note that no part of the transaction, as detailed in these agreements, provides for the making of any loan to Flynn and his associates, or any of them, or for their giving any of their property as a pledge for any loan made or to be made to all or any of them, or for their assuming the repayment to the Security Company of the $1,200,000 which it paid for the stock and bonds of the Supply Company or of any part of the $3,280,000 which it was to, and actually did, supply to the Supply Company for the purpose of enabling the latter to proceed with the construction of the water works.
However, even assuming, but without deciding, that complainants' contention is correct and that they in consequence thereof were entitled to an accounting; nevertheless they, by *Page 70 
reason of their great delay in instituting their present action, must now be held to be barred from obtaining the relief which they here seek. Their cause of action, if any, accrued on June 29th, 1904, when Flynn, McCarty, Coffey and Cocheu were notified by the Security Company that it, in accordance with the provisions of Agreement "B," had canceled their $6,255,000 note. Their right to an accounting, if any, accrued no later than October 10th, 1911, when, as stated in the bill of complaint, their alleged indebtedness was fully paid out of the money then received by the Security Company from Jersey City for the completed water works.
The bill of complaint, however, was not filed until May 5th, 1926. For this great delay in asserting their alleged rights, complainants have shown no adequate excuse. Courts of equity, in the absence of any analogous statutory bar, have invariably, upon general principles of their own, declined to grant relief upon stale demands. Laches and unjustifiable neglect are always discountenanced by this court and will, whenever good faith and reasonable diligence is wanting, effectively stay its hand.Lutjen v. Lutjen, 64 N.J. Eq. 773; 53 Atl. Rep. 625; Mealey
v. Howard, 79 N.J. Eq. 93; 81 Atl. Rep. 1108; affirmed, 79 N.J. Eq. 224; Pine v. Gardner, 103 N.J. Eq. 69; 142 Atl. Rep. 50;Chapen v. Wright, 41 N.J. Eq. 438; 5 Atl. Rep. 574. The reason for this wholesome rule may be found in the difficulty and often utter impossibility of ascertaining, after a great lapse of time, the facts necessary to enable the court to exercise its powers with safety. As aptly stated by Mr. Justice Trenchard, in speaking for the Court of Errors and Appeals in Soper v.Cisco, 85 N.J. Eq. 165, 174, "The general rule is well settled that he who, without adequate excuse, delays asserting his rights until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure that it is impossible for the court to see whether what is asserted to be justice to him is not injustice to his adversary, has no right to relief."
Here, more than twenty-one years intervened between June 29th, 1904, when Flynn, McCarty, Coffey and Cocheu, received notice of the cancellation of their $6,255,000 note *Page 71 
with its consequent termination of their right to reacquire the property under Agreement "B," and May 5th, 1926, when complainants filed their bill. Nearly fifteen years elapsed between October, 1911, when, as complainants allege, the Security Company was fully paid, and May 5th, 1926, when they instituted their present action. After the elapse of all that time, complainants so prosecuted their action that it was not until April 25th, 1935, before it was duly brought to trial, and at which they for the first time attempted to show, by means of statements and promises alleged to have been made by Messrs. Gardiner and Baker to Mr. Cocheu to the effect that the Security Company would account to and settle up with Flynn and his associates, that the parties to Agreements "A" and "B" intended the transaction to be a loan and pledge, rather than a sale.
But defendants, as a result of complainants' inexcusable delay, have now been deprived of the benefit of the testimony of Senator Edwards who died in 1915, William H. Corbin who died in 1912, Mr. Baker who died long before the case was brought to trial, Mr. Gardiner whose memory, as a result of severe illness, became so impaired in 1919 that he at the time of the final hearing was incapable of even being spoken to, and also that of all of Mr. Flynn's associates, excepting Mr. Cocheu, each of whom died before the institution of the present action. The testimony of all of these individuals who participated in the negotiations or preparation of Agreements "A" and "B," undoubtedly would have been of great aid to this court in ascertaining, after so long a lapse of time, what the real intent of the parties to the transaction was, the present proofs concerning which are so obscure, unreliable and unconvincing as to preclude this court from exercising its powers with safety and justice to all the parties in interest. For this situation, the blame lies with none other than the complainants.
In view of the foregoing, defendants are entitled to a decree dismissing the bill of complaint. *Page 72